UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
H.W. and A.W., individually and on behalf of
their son M.W. a minor,

                        Plaintiffs,

        -against-

NEW YORK STATE EDUCATION DEPARTMENT;
JOHN B. KING, JR., in his representative role as
Commissioner of Education for the New York State
Education Department; OFFICE OF STATE REVIEW,
and MANHASSET UNION FREE SCHOOL
DISTRICT,

                      Defendants.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**
CV 13-3873 (SIL)

**FILED**
IN CLERK'S OFFICE
DISTRICT COURT E D N Y

★ MAR 31 2015 ★

LONG ISLAND OFFICE

**APPEARANCES:**

**MORITT HOCK HAMROFF & HOROWITZ LLP**
Attorneys for Plaintiffs
400 Garden City Plaza, Suite 202
Garden City, NY 11530
By: Robert L. Schonfeld, Esq. and Nancy Hampton, Esq.

**FRAZER & FELDMAN, LLP**
Attorneys for Defendant
1415 Kellum Place
Garden City, NY 11530
By: Laura Ferrugiari, Esq. and Joseph W. Carbonaro, Esq.

**LOCKE, Magistrate Judge:**

    Before the Court on consent of the parties is a motion for modified *de novo* review, Docket

Entry ("DE") [35], submitted by Plaintiffs H.W. and A.W. ("Plaintiffs" or "parents"), individually

and on behalf of their son, M.W. ("M.W."), pursuant to the Individuals With Disabilities Education

Act, 20 U.S.C. §1400, *et seq.* ("IDEA"). Plaintiffs seek review of the July 29, 2013 Decision of

State Review Officer Stephanie Deyoe (the "SRO"), which reversed the August 28, 2012 Decision

placement for M.W.  Also before the Court is a cross-motion for summary judgment by defendant Manhasset Union Free School District ("the District").[1]  Cross-motion, DE [32].  For the reasons set forth herein, Plaintiffs' motion is granted in part and denied in part, and the District's cross-motion is granted in part and denied in part.

## BACKGROUND

### I. STATUTORY FRAMEWORK

"The IDEA seeks to provide to all children with disabilities 'a free appropriate public education that emphasizes special education and related services.'" *C.L. v. Scarsdale Union Free Sch. Dist.,* 744 F.3d 826, 831 (2d Cir. 2014) (quoting 20 U.S.C. § 1400 (d)(1)(A)) (additional citations omitted).  A free appropriate public education ("FAPE") "consists of special education and related services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits, and provided in conformity with an individualized education program, or IEP." *Reyes ex rel. R.P. v. New York City Dep't of Educ.,* 760 F.3d 211, 214 (2d Cir. 2014) (internal quotation marks and citations omitted).  To ensure that disabled children receive a FAPE, school districts must create an individualized education program ("IEP") setting forth the particular educational needs of a disabled child and the services necessary to meet those needs.  *See Frank G. v. Bd. of Educ.,* 459 F.3d 356, 363 (2d Cir. 2006).  The IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *D.D. ex rel. V.D. v. New*

---

[1]The remaining Defendants, New York State Education Department, John B. King, Jr., and the Office of State Review (the "State Defendants"), were voluntarily dismissed from the case in December 2013.  *See* DE [23].

*York City Bd. of Educ.,* 465 F.3d 503, 507-08 (2d Cir. 2006) (internal quotation marks omitted), *amended on denial of rehearing,* 480 F.3d 138 (2d Cir. 2007); *see also* 20 U.S.C. § 1414 (d)(1)(A) (setting forth IEP requirements). The IEP must be reviewed at least annually and revised to reflect the child's need. 20 U.S.C. § 1414(d)(2-4). Substantively, the IEP must be "likely to produce progress, not regression, and [must] afford[] the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 254 (2d Cir. 2009) (per curiam) (internal quotation omitted).

In New York, the responsibility for developing appropriate IEPs has been assigned to local Committees on Special Education ("CSE") the members of which are appointed by school boards or the trustees of school districts. *See* N.Y. EDUC. LAW §4402 (1)(b)(1) (McKinney 2010). A CSE "must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *R.E. v. New York City Dep't of Educ.,* 694 F.3d 167, 175 (2d Cir. 2012) (citing N.Y. EDUC. LAW §4402 (1)(b)(1)(a)). In developing a child's IEP, a CSE is required to consider: (1) academic achievement, functional performance, and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs. *See* N.Y. COMP. CODES R. & REGS ("NYCCRR") tit. 8, § 200.1(ww)(3)(i).

The IDEA also requires that "[t]o the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). This requirement "expresses a strong preference for children with disabilities to be educated, to the

maximum extent appropriate, together with their non-disabled peers." *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation omitted).  Upon consideration of alternative placements, the CSE "must place each disabled child in the least restrictive educational environment that is consonant with his or her needs." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.,* 752 F.3d 145, 161 (2d Cir. 2014).  The placement in the least restrictive environment ("LRE") is not an absolute requirement, however, and "the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ.,* 546 F.3d 111, 119 (2d Cir. 2008) (quoting *Briggs v. Bd. of Educ. of Conn.,* 882 F.2d 688, 692 (2d Cir. 1989)).

A parent who disagrees with an IEP may challenge it by requesting an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), conducted before an impartial hearing officer ("IHO") designated by the local school board.  *See* N.Y. EDUC. LAW § 4404(1)(a).  The decision by the IHO may be appealed to a State Review Officer ("SRO"), *see* N.Y. EDUC. LAW § 4404(2), and the SRO decision may be challenged in either state or federal court.  20 U.S.C. § 1415(i)(2)(A).  The parents may also unilaterally "enroll the child in a private school and seek reimbursement for the cost of the private school education from the local education agency." *C.L.,* 744 F.3d at 831 (citing 20 U.S. § 1412(a)(10)(C)(I & ii) (additional citations omitted).  New York law requires that a parent seeking tuition reimbursement must persuade the IHO of the appropriateness of such placement.  N.Y. EDUC. LAW § 4404(1)(c).

## II.  FACTUAL BACKGROUND

The facts are drawn from the materials submitted to the Court including the certified copy of the administrative record, transcripts and exhibits of the impartial hearing, and the parties' Local

56.1 Statements. The facts are undisputed unless otherwise noted.[2]

M.W. was born on April 21, 2001 and has been classified by the District's CSE as autistic. He has been diagnosed with pervasive developmental disorder-not otherwise specified. Plaintiffs claim that M.W. "has a severe language disability that interferes with all aspects of his education, including his ability to interact socially." Pls' 56.1 Stmt ¶ 3. The District admits only that M.W. "exhibits delays in language, communication and socialization." Def's 56.1 Resp. ¶ 3. M.W. began his attendance in the District's public school system in kindergarten in 2006-07, and continued through the summer of the 2011. He repeated the 1st grade for the 2008-09 school year.

In addition to services within the District, M.W. received private services from Dr. Sima Gerber, PH.D., CCC, a New York State licensed speech-language pathologist, for five years before the hearing. Tr. at 1825. She also observed M.W. in the District's after-school program during the 2010-11 school year and prior years.

**A. IEP for the 2010-11 School Year**

Since he repeated 1st grade, M.W. was considered to be a third-grader for the 2010-11 school year, though he was chronologically a 4th grade student. For the 2010-11 school year, the District's CSE recommended the same program for MW that it had recommended and implemented the prior year, 2009-10 – 12:1+2 (12 students, 1 special education teacher, and 2 classroom assistants) in a self-contained classroom for the five-hour instructional day, with a 1:1 classroom assistant for all instructional time. Pls' 56.1 Stmt ¶ 5. The District adds that he received instruction for math and

---

[2]References to the voluminous hearing transcripts are cited as "Tr. at –." For each motion, the parties have submitted a Local Rule 56.1(a) Statement of Material Facts, *see* Plaintiffs' Rule 56.1 Statement ("Pls' 56.1 Stmt"), DE [33] and Defendant's Rule 56.1 Statement ("Def.'s 56.1 Stmt"), DE [32-1], and a response to the other side's statement. *See* Defendant's Rule 56.1 Statement in Response ("Def.'s 56.1 Resp."), DE [32-1] and Plaintiffs' 56.1 Statement in Response ("Pls' 56.1 Resp.") DE [34] .

reading in the special class, but transitioned into an integrated co-teaching classroom ("ICT") for science, social studies, and specials (art, music, library, and gym) and had a classroom assistant for those transitions. Def's 56.1 Stmt, ¶ 12. Plaintiffs claim that he was not actually mainstreamed for the full year in social studies and science, and that there was no specialized reading program. Pls' 56.1 Resp. ¶ 12. The IEP indicates that he was to have a classroom assistant "[d]uring [i]nstructional [t]ime," specifically "[w]hen he is in the general education class and participating in science, art, library. Assist student with transition and attending." Def.'s Ex. 3 at p.4.[3]

### B. Implementation of the IEP for the 2010-11 school year

Plaintiffs claim that as early as November 2010, H.W. advised M.W.'s teachers and the school psychologist that he did not understand classroom assignments and could not complete his homework due to reading comprehension problems and difficulty with 3rd grade level concepts and words. Pls' Stmt ¶ 7; Tr. at 1448. In January 2011, Dr. Gerber and H.W. discussed special education programs using a language-based curriculum to address the needs of students with severe language delays. Tr. at 1846-50. Dr. Gerber and H.W. visited one such school, the School for Language and Communication Development ("SLCD") in Glen Cove, New York, in January 2011. In a Progress Report dated January 20, 2011, Dr. Gerber reported M.W.'s progress after twice weekly individual therapy sessions from August to December 2010. Def.'s Ex. 6. The report referenced the visit to SLCD, and reflected both Gerber's and H.W.'s feeling that it would be a "more appropriate school placement." *Id.* at 3. Dr. Gerber further indicated that she was "convinced that [M.W.'s] current placement will not be able to meet his needs" and further stated that H.W. was

---

[3]The citations to Defendant's Exhibits ("Def's Ex.") and Plaintiffs' Exhibits ("Pls' Ex.") are to the Exhibits introduced at the impartial hearing and are part of the administrative record.

"pursuing the steps that are necessary to make a case for an alternative school placement." *Id.*

A team meeting with M.W.'s teachers was held with H.W. on February 2, 2011. Tr. at 1451-52. On February 3, 2011, H.W. wrote an e-mail to Jodi Shapiro, the CSE Coordinator, expressing her concerns. Pls' Ex. B, at 1; Tr. at 1452-53. On March 2, 2011, H.W. met with Shapiro, where H.W. claims to have asked Shaprio about language-based programs and specifically asked about four or five other schools. Tr. at 1456. Shapiro recalled discussing reading programs, not language-based programs. Tr. at 550-51. Shapiro didn't discuss BOCES or other programs because she "felt strongly" that M.W.'s needs could be met in Manhasset. Tr. at 552. During this meeting, H.W. requested a CSE meeting to change M.W.'s goals. Tr. at 1460-61. Due to conflicting schedules the meeting was not held until May 27, 2011, the date of the CSE's annual review. *See* Tr. 471-72, 1461-62; Def.'s Ex. 14.

### C. M.W.'s performance during the 2010-11 school year

The parties pointedly dispute the extent of M.W.'s progress, or lack thereof, during the 2010-11 school year. Plaintiffs claim that he did not improve and failed to meet many criteria set forth in the IEP while the District claims that there were many areas of improvement and that M.W. made meaningful progress.

1. Standardized Test results

The record indicates that numerous tests were administered to M.W., both by the District and by independent professionals hired by his parents. *See* Def's Ex. 2 at 2-6. Several of those tests relied on by the parties, the IHO, and the SRO are discussed below. Generally, Plaintiffs rely on test scores to show M.W.'s lack of meaningful progress while the District argues that standardized tests are not a reliable indicator of his abilities.

A Speech/Language Annual Review dated May 16, 2011 prepared by District Speech Language Therapist Lynn Prisco, contains M.W.'s scores for the Oral and Written Scales standardized tests taken in both April 2010 and March 2011. Def.'s Ex. 15. Those tests were administered without any assistance. Tr. at 1024-25. In 2011, M.W. scored in the 3rd percentile in Listening Comprehension, up from the 2nd percentile in 2010, in the .1 percentile in Oral Expression, unchanged from 2010, and in the .3 percentile in Oral Composite, up from the .1 percentile in 2010. *Id.* These results indicate a severe language disability. Tr. at 1022. Prisco indicated that the results only showed M.W.'s language "in a sterile testing environment" and that "his functional language was much higher than these test scores indicated. Tr. at 914, 1028. In a sterile testing environment, the person administering the test cannot repeat questions. As a result, Prisco testified, "[b]ecause I am not able to use any of the strategies that I taught [M.W.] in a testing session, he is not going to be able to show that much improvement in this task as opposed to in the classroom, [where] I am able to use many strategies incluing peer modeling in order for him to perform at his optimal level." Tr. at 1035-36.

A Lexile Reading test administered by the District in March 2011 resulted in a designation of Beginning Reader at the 1 percentile rank. Pls' Ex. S. A handwritten note from the teacher states that "[t]his is not considered an accurate representation of this student's skills. This student was unable to remain on task in order to complete the assessment. We made more than one attempt." *Id.* Tests of M.W.'s reading comprehension were also performed. In May 2009, M.W.'s teacher reported that he was reading on a "Fountas and Pinnell level of F. . . [t]his is slightly below grade level for a first grader in May." Pls' Ex. T. Two years later at the end of the 2010-11 school year, M.W.'s reading comprehension was at a first grade level and remained at level F. Tr. at 742-44; Pls'

Ex. O.

Dr. Gayle Herman, a private evaluator retained by the parents, administered several tests to M.W. including the Woodcock-Johnson Tests of Achievement ("Woodcock-Johnson" or "WJ-III"). M.W.'s special education classroom teacher, Erin McCormack, testified that she has administered this test, but does not consider it to be "accurate of a lot of my student's abilities." Tr. at 1738. As to M.W., testimony indicated that "Woodcock-Johnson definitely does not demonstrate what he is able to do and show[] his abilities." Tr. at 1606. For example, the language arts and writing section "doesn't show his ability at all, because of the time constraint." Tr. at 1802-03.

From the District's perspective, many of the test results are not accurate indicators of M.W.'s abilities due to the format of the test itself. For example, Dr. Herman in her report wrote that the WJ-III showed M.W.'s math skills to be "very limited" and that his "math fluency or ability to quickly and accurately solve simple one-digit addition and subtraction problems was very weak." Pls' Ex. G at 11. Ms. McCormack testified that this result surprised her because his math fluency is "pretty good," but went on to say that "in thinking about how the test is laid out, it doesn't surprise me because there are about at least 50 problems on one page and the numbers are very small, very close together, and so it could be very visually overwhelming" for students such as M.W. Tr. at 1612. She said that her experience with M.W. was that he could do one-digit addition and subtraction "with no problem," and that he was fine with multiple digits as well, getting 85 percent or better on second grade math curriculum tests. Tr. at 1612-13. Accordingly, McCormack's experience disputed Herman's conclusion that M.W. required "significant adult intervention for even low-level math problems." Tr. at 1617; Pls' Ex. GG at 11.

2. Neuropsychologist/Independent Evaluations

After nine hours of direct interaction with M.W. in March and April 2011, Tr. at 1311, Dr. Herman prepared a Neuropsychological Evaluation.[4] Pls' Ex. G. The observations took place both in Dr. Herman's office and in the District. The IHO relied on several of the findings from the Evaluation, for example, M.W. "needs significant adult intervention throughout activities in order to complete them." IHO Dec. at 19 (citing Tr. at 1223-24). Dr. Herman "strongly recommend[ed] that [M.W.] be placed in a special education program that specializes in speech and language disorders and their application to academic and social functioning for children with autistic spectrum disorders" and noted that "[c]onsistent support is needed to help [M.W.] to regulate his behavior and attentions so that he is alert and ready to learn to his best potential." Pls' Ex. G. He requires "a program that is smaller, that has less auditory distractions because he has difficulty with processing and distractibility, that has more opportunities for intervention to help elicit the language responses that are appropriate to what he is learning." Tr. at 1251-52. The IHO further noted Dr. Herman's disagreement with the lack of a 1:1 aide in the June 2011 IEP because Herman had "seen his functioning in both a small . . . class–class of 12 children and [seen] him in the ICT class, as well as one-to-one in my office, knowing how much intervention and redirection he needed from adults." IHO Dec. at 25-26 (citing Tr. at 1258).

M.W. was also the subject of a Language Evaluation performed by Speech-Language Pathologist Cecilia Navarro at Queens College. The evaluation was "to determine his current level of linguistic functioning and to make recommendations for an appropriate educational setting." Pls' Ex. F at 5. In the report dated April 15, 2011, Navarro found that M.W.'s difficulties with language

---

[4]The District challenged Dr. Gerber's credentials, but the IHO found her "qualified to have written the Neuropsychological Evaluation and to give her expert opinion about this child." IHO Dec. at 18 n.2.

comprehension "appear to be having the greatest impact on his overall development." *Id.* at 5-6.
She concluded that he "requires an instructional setting whereby those involved in his education are
knowledgeable about language development and experienced with the specific challenges presented
by children with severe language impairments" and that the "entire program should be language
based." *Id.* at 6.

### 3. Teacher Evaluations

Beyond strict academic progress, M.W.'s teachers provided evaluations of his progress in
non-academic areas such as socialization. At the CSE meeting, Rosenberg reported seeing "a real
change in [M.W.], and that he is becoming more social and he is really starting to regulate his
behavior." Pls' Ex. AA at 24. He progressed during snack time from having teachers set up
"partnerships" including M.W. to the point where he "was doing that on his own, he was taking a
book and sharing it with [a] group of children, and he wasn't talking at the children, they were all
talking together. That was a big change." Tr. at 680. His special education classroom teacher
reported that behaviorally, M.W. was doing great, especially in the mainstream class, where "he
looked like any other student in that class, he was focused, he was doing his work, he was right on
target." Tr. at 1111. In March 2011, he participated in class discussions only when called upon,
Pls' Ex. O, but towards the end of the year, he was raising his hand more on his own. Tr. at 798.

His scripting[5] behavior was "reduced tremendously," Tr. at 695, though there was evidence
that this behavior increased after school vacations. Pls' Ex. AA at 83. M.W. scripted more in the
special education class than in the ICT class. Tr. at 449-50. Regarding progress in writing, one

---

[5]The SRO noted that scripting "is described in the hearing record as the recitation of a TV show,
movie, video game or conversation that the student repeated verbatim." SRO Dec. at 12 n.10 (citations
omitted).

teacher noted that while M.W. had a really difficult time writing in the beginning of the year, by the end "he was able to write a few sentences on a subject matter, certainly with a graphic organizer and support beforehand, and structuring it in a way that he could understand, his literal comprehension improved." Tr. at 685.

Prisco, the District speech provider, testified that M.W. "made so much progress" in 2010-11 in the ability to be redirected, the ability to model peers, and the ability to be refocused or ask questions. Tr. at 1034. M.W. was able to use the smart board in front of the whole class, and peer modeling was having an effect in that M.W. "was able to actually work with another student to answer questions, to work on a project with him." Tr. at 1034. He was also more on task in the ICT classroom and referenced the behaviors of his typical peers to help inform him of what he needed to do. Tr. at 451. At the beginning of the year, he was able to engage in a lesson for two to three minutes at most, but by year end, he was able to engage in an entire language arts class. Tr. at 892-93. He also needed fewer verbal prompts to stay on task in the classroom. Pls' Ex. AA at 82.

### 4. Goals of the 2010-11 IEP

The Progress Report for IEP Goals for the 2010-11 school year ("Report") provides results from three different marking periods for the 27 goals set forth in that year's IEP. *See* Def.'s Ex. 10. The Report indicates that M.W. "achieved" 5 of 27 goals, 4 were marked "progressing satisfactorily." Of the 17 goals marked "see comment," 9 were marked "progressing satisfactorily" in the second marking period. Only one goal was marked as "not achieved."

### D. CSE meetings in May & June 2011, and the June 2011 IEP

The CSE held its annual meeting on May 27, and June 16, 2011. Prior to these sessions, Plaintiffs provided the CSE with the private evaluations of Dr. Herman and Ms. Navarra, and Dr.

Gerber's report from January 2011. Dr. Herman and Ms. Navarro also attended the CSE meetings. H.W. and the private evaluators requested more language-related goals and/or that M.W. attend a language-based program. For example, one evaluator noted that it's "the language piece that needs to be a thread throughout the entire day, in a cleaner and consistent way." Pls' Ex. AA at 178. In reply, Ms. Prisco noted that M.W. "is exposed to language the entire day" and that everyone who worked with M.W. attempted to keep him engaged with language and "we have in every way we could have possibly created that for him." Pls' Ex. AA at 178-79. Ms. Navarro opined that "the language enrichment that is [used] across elementary school does not necessarily serve the best interests of the language-impaired child because they are so far below everybody else that they can't . . . necessarily pull what they need to pull from it. . . because it just goes . . . too fast." Pls' Ex. BB at 209-10.

After the meetings were complete, the CSE issued its recommendation for the upcoming 2011-12 school year (the "June 2011 IEP"). *See* Def.'s Ex. 2. For the 2011-12 school year, M.W. would be placed in a 4th grade general education classroom for approximately one and ½ hours per day. SRO Dec. at 18. That class would have had from 20 to 23 students, including 3 special education students, and one teaching assistant. Tr. at 725, 2467. In addition, M.W. would daily attend a 12:1 special class consisting of one hour of math and one and ½ hours of reading instruction, and additional services including counseling services, increased occupational therapy, and increased speech/language therapy, both individually and in a small group setting. The June 2011 IEP also provided parent counseling and training services. Def.'s Ex. 2. No 1:1 aide or teacher assistant support was indicated.

The June 2011 IEP included an additional 2 hours per week of direct and indirect consultant

teacher services pushed into the 4th grade general education classroom. SRO Dec. at 18. Ms. Ferby-Guy, the proposed consultant teacher, testified that there would have been three other classified students in the classroom in addition to M.W. Tr. at 2468. The two hours of consultant teacher services would have included both direct and indirect services and would have been split into four days of the week, one hour on one day, and the additional hour spread out over three days. Tr. at 2470.

On June 20, 2011, the parents signed a contract with SLCD for the 2011-12 school year. Pls' Ex. FF. By letter dated June 29, 2011, the parents wrote to the District "formally requesting that the CSE reconsider" its recommendations set forth at the June 16, 2011 meeting. Def.'s Ex. 11. Noting M.W.'s low language comprehension, the letter asked that he be placed in a language-based program in either other public schools or private schools, and concluded that a fourth grade regular education classroom is not appropriate. Interpreting this request as one to re-convene the CSE, the District offered to schedule another meeting. Def.'s Ex. 11. The parents promptly responded that there was no request to convene the CSE, just a request to reconsider. Pls' Ex. E. The CSE did not meet again, nor did it reconsider its decision. M.W. attended a summer program in the District from July 5, 2011 through August 12, 2011, but enrolled in SLCD on September 6, 2011.

### E. M.W.'s Placement at SLCD

The administrative record includes two reports regarding M.W.'s performance at SLCD during the 2011-12 school year, a Classroom Report dated January 2012, Pls' Ex. JJ ("SLCD Class Rpt"), and a Progress Report for IEP Goals and Objectives dated March 12, 2012. Pls' Ex. II. The classroom report indicates that M.W. was placed "in a highly structured fourth grade classroom setting, in which teacher support and positive reinforcement are provided consistently." SLCD Class

Rpt at 1. M.W.'s reading comprehension was at mid-first grade level, and in math, M.W. was functioning at the 2nd grade level in calculation skills and at a 1st grade level for problem solving skills. *Id.* at 2. The report concludes that while he has made "slow, steady progress," his "language and attending difficulties persist" but that he "continues to benefit from a highly structured classroom setting, where he is given the right amount of individualized support, modeling, and positive reinforcement in order to establish and maintain skills." *Id.* at 3. The IEP Progress Report was attached to a notation from M.W.'s classroom teacher that given his current skills and language deficits, numerous goals on the IEP were not appropriate, and that revised goals had been prepared.

## III. ADMINISTRATIVE REVIEW

### A. Due Process Complaint and IHO Determination

On October 20, 2011, the parents filed a Due Process Complaint Notice with the District. Pls' Ex. A. The form includes an area entitled "Subject of the Complaint" and instructs the complainant to "[d]escribe the **nature of the problem** (the concerns that led you to request this hearing), including all **specific facts** relating to the disagreement. Attach additional pages or documents as necessary." *Id.* (emphasis in original). The complaint, which was completed by Plaintiffs' attorney, Nancy Hampton, consists of six paragraphs fitting into the space provided on the form and does not attach additional pages or materials. It reads as follows:

> The school district has failed to provide [M.W.] with a free, appropriate, public education for the 2010/2011 and 2011/2012 school year[s].
>
> [M.W.] is chronologically a 4th grade student and is classified with Autism. For the 2010/2011 school year, [M.W.] was placed in a 12:1+2 class for 5 hours daily and was pushed in to a 2nd grade general education class with a paraprofessional for part of the day. [M.W.] received related services of speech, occupational therapy, and an extended school day program. During the 2010/2011 school year,

the district's services providers reported that [M.W.]'s listening comprehension and expressive language decreased. It was also reported that [M.W.]'s "scripting" language increased as language demands increased and during school breaks. Despite the lack of progress, evidence of regression, concerns expressed by his teachers in team meetings, and requests by the parents to meet with the CSE, the CSE did not meet to recommend any change in the educational program provided by the district for 2010/2011 school year.

In February and March 2011, the parents obtained private evaluations by a neuropsychologist and speech language pathologist. Testing revealed that [M.W.]'s verbal and reading comprehension skills are at or below the first percentile. As a result of his severe language disability and his diagnosis of Pervasive Developmental Disorder, [M.W.] has clinically significant atypical social behaviors which preclude him from appropriate peer interaction. The neuropsychologist observed [M.W.] in the self-contained setting where [M.W.] required direct one-to-one intervention throughout the lesson and in the 2nd grade integrated setting where he was unable to keep up with the pace of the class and was socially inappropriate.

On May 27, and June 16, 2011, the Committee on Special Education met to discuss a program recommendation for the 2011/2012 school year, 4th grade. The parents requested that [M.W.] be placed in a language-based program that could address his severe language disability throughout the school day. Despite the test results of the private evaluations, the written and verbal input from these evaluators, and the lack of progress in the primarily self-contained program for 3rd grade, the CSE recommended placing [M.W.] in a 4th grade general education class with a smaller class for math and related services on June 16, 2011.

On June 29, 2011, the parents requested that the CSE reconsider its clearly inappropriate recommendation, to no avail. On July 13, 2011, the parents advised the school district that they would be placing [M.W.] at the School for Language and Communication Development in Glen Cove, N.Y., and requested tuition reimbursement and transportation. On August 3, 2011, the district denied transportation on the basis that it was not requested prior to the April 1st deadline.

*Id.* The proposed solution set forth on the complaint was that "[t]he school district reimburse the parents for tuition, transportation, and expenses related to the unilateral placement of [M.W.] at the

School for Language and Communication Development for the 2011/2012 school year." *Id.*

Susan Mills Richmond, Esq., was appointed to serve as the IHO and conducted a hearing that took place on fifteen non-consecutive days between January 2012 and July 2012. A total of twelve witnesses testified during the hearing. The parents' witnesses included: M.W.'s mother, Plaintiff H.W.; Dr. Christine Radiewicz, Director of SLCD; Kristie Danielson, M.W.'s teacher at SLCD; Jennifer Klocek, M.W.'s speech provider at SLCD; Dr. Gayle Herman, psychologist; and Dr. Sima Gerber, speech provider and associate professor at Queens College. Testimony on behalf of the District was heard from: Alison Rushforth, District Executive Director of Special Education; Jodi Shapiro, District Coordinator for Preschool and Elementary Special Education; Janice Rosenberg, M.W.'s ICT teacher; Lynn Prisco, M.W.'s District speech provider; Erin McCormack, M.W.'s special education classroom teacher; and Karen Y. Ferby-Guy, District Special Education teacher.

The IHO issued a decision on August 28, 2012 and found in favor of the parents, concluding that the June 2011 IEP was inappropriate to meet M.W.'s needs, that the parents' placement at SLCD was appropriate, and that the equities favored the parents. DE [35-3] ("IHO Dec.") at 43. The IHO further ordered the District to reimburse the parents $46,000.00, the cost of M.W.'s tuition at SLCD for the 2011-12 school year.

The IHO did not make a specific finding about the adequacy of the IEP for the 2010-11 school year, but she did conclude that M.W. performed poorly on standardized tests and that he "made very little if any progress during School Year 2010-2011." IHO Dec. at 4, 5. The IHO's decision makes clear that the program at issue in the hearing was for the 2011-12 school year. IHO Dec. at 4.

The IHO stated that the thrust of her conclusions is that "the proposed mainstreaming would

strand MW in a class in which he would not have been able to function, thereby further enlarging the ever-widening gap between MW and his peers and thereby not providing a FAPE for this child." IHO Dec. at 14. She largely based her findings regarding the appropriateness of the June 2011 IEP on the quality of M.W.'s performance during 2010-11 juxtaposed with the ambitious leap of goals for the 2011-12 school year. She found that despite M.W.'s

> lack of progress shown in the District's own Progress Reports in M.W.'s second attempt at a 2nd grade setting, which 2nd grade setting included the support of two special education teachers and a 1:1 teacher assistant, the District argues that the CSE Program at issue for 2011-2012 consisting of a 4th grade general education class, with 22-23 students, and without the level of support given in 2010-2011 is appropriate. . . Such CSE Program clearly is not appropriate.

IHO Dec. at 17. Given M.W.'s poor test results, "the CSE should not have recommended the program at issue at this hearing consisting of a general education placement with special education pullouts for some subjects and no 1:1 aide assigned to MW." IHO Dec. at 5.

The IHO repeatedly emphasized her finding that the lack of a 1:1 aide in the June 2011 IEP was a critical factor in her determination that the placement was not appropriate. For example:

- "The parents also elicited convincing testimony that the lack of a one-to-one aide to refocus the child makes the CSE Program inappropriate." IHO Dec. at 8-9 (citing Tr. at 1258).

- "Importantly, as noted above, this IEP did not include the service of a 1:1 assistant in the 4th grade general education class." IHO Dec. at 27.

She further stated that there was no apparent reason why 1:1 support was excluded from the June 2011 IEP. Indeed, the IHO cited Ms. Ferby-Guys' testimony that M.W. "could have had a teaching assistant in the class he was scheduled to be in." IHO Dec. at 12 (emphasis in original) (citing Tr. at 2458-59); *see also* Tr. at 2491 (M.W. "required a specific amount of one-to-one instruction").

In light of her finding that the District failed to provide a FAPE for M.W., the IHO went on to examine the SLCD, which the IHO noted is approved by the New York State Education Department to provide special education programs and services. IHO Dec. at 30. The IHO found M.W.'s placement here to be "very appropriate." He is placed in a classroom of twelve students, two special education teachers, and two teaching assistants (12:2:2). Tr. at 2114. There is a classroom management plan to address M.W.'s attention issues, and one of the two aides sits next to him. Tr. at 2131. The class is considered to be a 4th grade class, but the students are functioning from a 1st to 3rd grade level. Tr. at 2115. Applying language-based theories, the "focus is on the language and then fourth grade concepts are introduced through that." Tr. at 2286.

The IHO found that the SLCD program of "constant modeling of language throughout the day," IHO Dec. at 33 (citing Tr. at 2118), to be particularly important. The speech therapists, teaching assistants, physical and occupational therapists and counselors all model language. Tr. at 2118. Visual supports and manipulatives are paired with language throughout the day as reinforcements. Tr. at 2120-21.

As to his actual performance, there is evidence that he progressed in several areas. Decoding skills improved from early second grade level to mid-second grade level. Tr. at 2127. According to Reading Milestone tests, from September 2011 to April 2012, he progressed from Level 2 (1st grade) to Level 3 (end of 1st grade). Tr. at 2125. He has also improved in his ability to identify simple story elements and to look back in the text for answers. Tr. at 2162. His mother also testified to improvement in his ability to do homework, finishing it "almost completely alone" where previously he could never complete it. Tr. at 1512.

Finally, as will be discussed further below, the final factor in determining whether the parents are entitled to tuition reimbursement is the "balance of the equities," and the IHO found that it had been "convincingly established" that the equities favor the parents. She addressed the District's "unsubstantiated conjecture" that the parents selected SLCD in the winter of 2011 prior to the CSE meetings and found that the District's "unsupported arguments were convincingly rebutted by the Parents at the hearing." IHO Dec. at 41.

Based on all the findings, the IHO found in favor of the parents and ordered the District to reimburse them for the costs of tuition for the 2011-12 school year. IHO Dec. at 43.

## B. SRO Decision

The SRO issued a decision on July 29, 2013. DE [35-2] ("SRO Dec."). As a threshold matter, the SRO determined that the IHO had exceeded the permissible scope of review by considering issues not properly raised by Plaintiffs in their due process complaint. Specifically, the SRO found that because the issues were not raised in the complaint notice, the IHO had erred in determining: (1) that the June 2011 IEP should have provided M.W. with a 1:1 aide; (2) that the June 2011 IEP did not provide for team meetings; and (3) that the June 2011 did not provide strategies to address the student's difficulties with attention and comprehension.[6] Regarding the 1:1 staffing issue, the SRO found that the "sole reference [in the due process complaint] to the individualized attention received by the student during the 2010-11 school year cannot be reasonably read to include a claim that the CSE failed to provide a 1:1 aide to the student for the 2011-12 school year." SRO Dec. at 10.

---

[6]Although the District had also urged the SRO to find that the IHO had improperly determined that the June 2011 IEP lacked appropriate annual goals, the SRO found that the District had "opened the door" to this issue by raising it on direct examination. SRO Dec. at 11.

Regarding M.W.'s progress during the 2010-11 school year, the SRO found that meaningful progress had been made. She determined that even if the test results showed minimal progress, "the hearing record as a whole supports the conclusion that the student made meaningful progress in the district's program during the 2010-11 school year." SRO Dec. at 12. The SRO then rejected the IHO's finding that the goals set forth in the June 2011 IEP were "too ambitious" and "completely inappropriate." SRO Dec. at 15 (quoting IHO Dec. at 25-26). The SRO noted that the CSE had reviewed M.W.'s annual goals, carrying over some and modifying others, and that those goals were appropriate "based on his identified needs and present levels of performance." SRO Dec. at 16, 17.

The SRO determined that the hearing record showed that the June 2011 IEP would have been in the least restrictive environment and "individualized to the student's strengths and needs through a modified curriculum and incorporation of a variety of modifications and accommodations to enable the student to receive appropriate educational benefit." SRO Dec. at 18 (citations omitted). She further credited District testimony that a separate classroom in the reading program would be created "for students who required more modification of work" or "a slower pacing." SRO Dec. at 19 (citing Tr. at 525).

Finally, the SRO addressed Plaintiffs' request for a language-based program. The SRO first noted that there is no standard for a language-based program in the IDEA or in federal or state regulations. Judging by the descriptions of such a program by Plaintiffs' private evaluators, the SRO found that "the June 2011 IEP offered the student a supportive, structured environment with an intense language-based curriculum, multisensory instruction, individual attention, individualized instruction, and small group class, and that the program effectively addressed the student's language,

attention, academic, and social deficits." SRO Dec. at 19 (citations omitted). Accordingly, the SRO found the IHO's conclusion to be unsupported by the hearing record and determined that the District offered M.W. a FAPE for the 2011-12 school year. SRO Dec. at 20.[7]

## IV. PROCEDURAL HISTORY

Plaintiffs commenced this action on July 11, 2013, naming both the State and District Defendants, and alleging violations of the IDEA and the Due Process Clause of the 14th Amendment due to the State Defendants' failure to discharge their duties by timely deciding the appeal of the IHO's decision. According to the Complaint, the District filed its appeal from the IHO's decision on or about October 1, 2012, and Plaintiffs' answer was submitted to the SRO on or about October 12, 2012. Federal regulations require that a final decision be reached within 30 days. *See* 34 C.F.R. § 300.515(b). Plaintiffs claimed that although the SRO decision was due on or before November 11, 2012, no decision had been issued as of July 11, 2013, the date of the filing of the complaint. Compl. ¶ 36.

After the complaint was filed, the SRO, on July 29, 2013, issued the decision sustaining the District's appeal and reversing the order of the IHO. By letter that same date addressed to counsel for both sides, the SRO acknowledged that the decision should have been rendered on November 5, 2012, and that the issuance of the decision, 266 days late, was not compliant with federal requirements.[8]

On August 29, 2013, Plaintiffs amended their complaint and seek a modified *de novo* review

---

[7]Given this determination, the SRO found that it was not necessary to reach the questions of whether SLCD was an appropriate placement or whether equitable considerations favored the parents. SRO Dec. at 20.

[8]This letter appears at the end of the SRO Decision submitted by Plaintiffs in support of their motion. *See* DE [35-2].

and reversal of the SRO's Decision. The State Defendants were voluntarily dismissed on December 20, 2013. *See* Stipulation, DE [23].[9] On July 17, 2014, the parties filed the motions currently before the Court: Plaintiffs' motion for modified *de novo* review, DE [35], and the District's cross-motion for summary judgment. DE [32]. On October 23, 2014, the parties consented to this Court's jurisdiction for all purposes. *See* DE [39].

## DISCUSSION

### I. LEGAL STANDARDS OF REVIEW

In the IDEA context, a motion for summary judgment is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.,* 397 F.3d 77, 83 n.3 (2d Cir. 2005) (quotation and citation omitted); *see also T.P.,* 554 F.3d at 252 (noting that summary judgment in the IDEA context is a "pragmatic procedural mechanism for reviewing administrative decisions" (internal quotation marks and citation omitted)). The court's review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *M.H. v. New York City Dep't of Educ.,* 685 F.3d 217, 244 (2d Cir. 2012) (internal quotation and citations omitted). It has been characterized as a modified *de novo* review that requires the district courts to "conduct an independent review of the evidence and make a determination based on a preponderance of the evidence." *A.L. v. New York City Dep't of Educ.,* 812 F. Supp. 2d 492, 501 (S.D.N.Y. 2011).

It is well-established, however, that "the role of the federal courts in reviewing state

---

[9]In light of the SRO's failure to render a timely decision, Plaintiffs in the Amended Complaint further sought pre-judgment interest from the date the State Defendants were required to issue the SRO decision. Am. Compl. ¶ 45. The Stipulation voluntarily dismissing the State Defendants, however, contained a paragraph indicating that Plaintiffs "shall seek no relief, including, but not limited to, attorneys' fees, back tuition reimbursement, future tuition and other fees" from the District Defendants "based on an alleged lack of timeliness by the SRO in this matter." Stipulation, DE [23].

educational decisions under the IDEA is circumscribed, " *Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 112 (2d Cir. 2007) (internal quotation and citation omitted), because the courts "lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 208, 102 S. Ct. 3034, 3052 (1982) (internal quotation and citation omitted). While the court does not "rubber stamp" administrative decisions, it may not "substitute [its] own 'notions of sound educational policy for those of the school authorities' under review." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013) (quoting *M.H.,* 685 F.3d at 240); *see also Rowley,* 458 U.S. at 205-06, 102 S. Ct. at 3050 (courts must give "due weight" to the results of the administrative process). Nor may the court make "subjective credibility assessment[s]" or choose "between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *M.H.,* 685 F.3d at 240 (quoting *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 383 (2d Cir. 2003)).

The analysis of the amount of weight given to the administrative proceedings "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive." *M.H.,* 685 F.3d at 244. The court may consider "the quality and thoroughness of the reasoning, the type of determination under review, and whether the decision is based on the administrative body's familiarity with the evidence and the witnesses." *Reyes,* 760 F.3d at 218.

Here, the decisions of the IHO and the SRO are in conflict, with the District prevailing on appeal. "Where there is a conflict between the original and appellate administrative rulings, deference is ordinarily due to the state appellate decision." *T.K. v. New York City Dep't of Educ.,*

32 F. Supp. 3d 405, 416 (E.D.N.Y. 2014) (citing *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68 (2d Cir. 2014)); *see also Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir.1984) (noting that courts must "defer to the final decision of the state authorities," even if "the reviewing authority disagrees with the hearing officer"). The quality and substance of the SRO Decision affects the amount of deference it should receive. *See R.E.*, 694 F.3d at 189. If the SRO's decision does not warrant the typical deference due to its lack of quality or insufficient reasoning, "it is appropriate for the district court 'to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment.'" *P.L. v. New York City Dep't of Educ.,* – F. Supp. 3d –, 2014 WL 4907496, at *8 (E.D.N.Y. Sept. 29, 2014) (quoting *M.H.,* 785 F.3d at 246); *see also R.E.,* 694 F.3d at 189 (the court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead").

## II. SCOPE OF REVIEW

As a threshold issue, the Court addresses the SRO's finding that the IHO exceeded her jurisdiction in considering the lack of 1:1 staffing support for M.W. in the June 2011 IEP. The SRO concluded that the due process complaint did not sufficiently raise the issue, and thus it was inappropriate for the IHO to render a determination on the issue or to consider it as part of her determination that the District failed to provide M.W. with a free and public education.

"Failure to exhaust the remedies provided in th[e] review process, the Second Circuit has long held, deprives a federal court of subject-matter jurisdiction to consider the claim on appeal from the SRO." *A.M. ex rel. Y.N. v. New York City Dep't of Educ.,* 964 F. Supp. 2d 270, 283 (S.D.N.Y.

2013) (citing *Cave v. East Meadow Union Free Sch. Dist.,* 514 F.3d 240, 243 (2d Cir. 2008) (additional citations omitted). Applying this rule, courts have held that issues not raised in the due process complaint are not reviewable in federal court. *See, e.g., B.P. v. New York City Dep't of Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y.2012) (stating that "[t]he scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial hearing request or agreed to by Defendant").

Subsequent to the issuance of the SRO's decision in this case, however, the Second Circuit held that "the waiver rule is not to be mechanically applied" and that the "key to the due process procedures is fair notice and preventing parents from 'sandbag[ging] the school district' by raising claims after the expiration of the resolution period." *C.F.,* 746 F.3d at 78 (quoting *R.E.,* 694 F.3d at 187 n.4). In *C.F.,* the Second Circuit found that "arguments not directly raised in a Due Process Complaint were not foreclosed because (1) the Due Process Complaint 'provided fair notice to the Department of' the argument at issue; (2) 'both the IHO and SRO reached the issue on the merits, giving [the federal court] a record for review'; or (3) the argument goes to the 'heart of this dispute.'" *C.U. v. New York City Dep't of Educ.,* 23 F. Supp. 3d 210, 223-24 (S.D.N.Y. 2014) (quoting *C.F.,* 746 F.3d at 78). The *C.F.* Court overturned the district court determination that consideration of the 1:1 staffing ratio issue was foreclosed, finding that the dispute over staffing ratio directly related to the student's maladaptive behaviors, and that the due process complaint plainly alleged that the District failed to address the student's behaviors. *C.F.,* 746 F.3d at 78.

In light of this "more plaintiff-friendly standard,"*C.U.*, 23 F. Supp. 2d at 224, the Court finds that the issue of a 1:1 placement for M.W. was properly considered by the IHO. The CSE's recommendation for 2011-12 removed the 1:1 staffing that had been part of M.W.'s IEP for

previous years, including 2010-11. The Due Process Complaint clearly stated the parents' claim that in the spring of 2011, M.W. "**required** direct one-to-one intervention throughout the lesson and in the 2nd grade integrated setting where he was unable to keep up with the pace of the class. . . ." Due Proc. Compl. at 2 (emphasis added). Although the main focus of Plaintiffs' complaint was on placing M.W. in a "language-based program," the clear implication of the reference to M.W.'s difficulties even with 1:1 assistance was sufficient to put the District on notice that its failure to continue such staffing was at issue. *See also P.K. ex rel. S.K. v. New York City Dep't of Educ.,* 526 F.App'x 135, 140 n.6 (2d Cir. 2013) (although not specifically enumerated, alleged insufficiency of 1:1 services was "fairly identified" by broad language in the due process complaint).

In addition, the IHO reached the issue of 1:1 staffing on the merits and the issue goes to the heart of concerns regarding M.W.'s ability to progress. Accordingly, the Court finds that the IHO did not exceed her jurisdiction when she determined that the lack of a 1:1 aide contributed to the District's failure to offer a FAPE for 2011-12, and that the SRO erred in concluding otherwise. The Court will thus accord greater deference to the SRO's decision with the exception of the review of the appropriateness of the June 2011 IEP. On that issue, the Court will give deference to the more thorough, complete decision rendered by the IHO.

**III. ANALYSIS**

Where parents believe that the District's IEP fails to offer their child a FAPE, "they may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Gagliardo,* 489 F.3d at 111 (citations omitted). In a tuition reimbursement case, the court engages in the three-pronged, *Burlington/Carter* test where: "(1) the [District] must establish that the student's IEP actually provided a FAPE; should the

[District] fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *M.W.,* 725 F.3d at 135; *see also Florence Cnty. Sch. Dist. Four v. Carter,* 510 U.S. 7, 114 S. Ct. 361 (1993)*; Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 105 S. Ct. 1996 (1985). The court need only consider the final two steps if it finds the IEP to be procedurally or substantively deficient. *See B.K. v. New York City Dep't of Educ.,* 12 F. Supp. 3d 343, 356 (E.D.N.Y. 2014); *L.M. v. East Meadow Sch. Dist.,* 11 F. Supp. 3d 306, 316 (E.D.N.Y. 2014).

### A. FAPE

The first prong of the *Burlington/Carter* test has two components: "'whether the state has complied with the procedures set forth in the IDEA' and 'whether the proposed IEP is substantively appropriate in that it is reasonably calculated to enable the child to receive educational benefits.'" *B.K.,* 12 F. Supp. 3d at 356 (quoting *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.,* 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks omitted)). Plaintiffs here argue that the IEP for 2010-11 was both procedurally and substantively defective, and that the 2011-12 IEP was substantively defective.

<u>1. Procedural Claim</u>

The Court first examines whether the District complied with procedures set forth in the IDEA. *See R.E.,* 694 F.3d at 190. Procedural violations, however, "only entitle parents to reimbursement if they impeded the child's right to a free appropriate public education, significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits." *C.F.,* 746 F.3d at 78-79 (internal quotation marks and citation omitted).

Plaintiffs claim that the SRO failed to address their claim that the District refused to review M.W.'s IEP during the 2010-11 school year and thus violated their procedural rights.  Am. Compl. ¶¶ 20, 34.  Under New York law, the SRO "shall review . . . any determination of the [IHO] relating to the determination of the nature of a child's handicapping condition, selection of an appropriate special education program or service and the failure to provide such program."  N.Y. EDUC. LAW § 4404 (2).  There is no indication, however, that the IHO made a determination for the SRO to review.  Plaintiffs' claim that the IHO decided the issue is based upon the statement in the IHO decision that "Mrs. W attempted in January 2011 without success to call to the attention of the District her 'serious concerns' about her son's 'abilities in the mainstream setting,' as well as the 'demands of 3d grade materials in the special class."  IHO Dec. at 9.  This statement does not constitute a concrete determination of a procedural failure.  The Court finds no clear finding by the IHO on the Plaintiffs' claim that there was a procedural defect in the District's alleged failure to revise the 2010-11 IEP, and therefore there was no decision for the SRO to review.

In any event, the alleged procedural violation concerns the IEP for the 2010-11 school year, and "[a] child's right to a FAPE is not prejudiced by delay where a court finds that the challenged IEP was adequate."  *M.O. v. New York City Dep't of Educ.,* 996 F. Supp. 2d 269, 272 (S.D.N.Y. 2014) (citing *Grim,* 346 F.3d at 381).  As will be discussed below, the Court agrees with the SRO's determination that the IEP in place for the 2010-11 was appropriate and as such, there is no basis for a procedural violation of IDEA.


2. Substantive Claims

The substantive inquiry requires the court to "examine whether the IEP was substantively

adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." *R.E.,* 694 F.3d at 190 (internal quotation marks and citation omitted). The IDEA does not guarantee "the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each [disabled] child." *Walczak,* 142 F.3d at 130 (quoting *Lunceford v. Dist. of Columbia Bd. of Educ.,* 745 F.2d 1577, 1583 (D.C. Cir. 1984) (Ruth Bader Ginsburg, J.)); *see also C.F.,* 746 F.3d at 72 (noting that the IDEA "does not require that a child be provided with the optimal programmatic alternative" but instead requires "selection of a program that provides a basic floor of opportunity, that is likely to produce progress, not regression"(internal quotation marks and citation omitted)).

The SRO's "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *M.H.,* 685 F.3d at 244. "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *T.Y. v. New York City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir. 2009) (quoting *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 195 (2d Cir. 2005)). With these standards in mind, the Court examines Plaintiffs' claims regarding substantive violations of the IDEA.

*a. Failure to provide a FAPE for 2010-11 school year*

Plaintiffs argue that the District's failure to review and revise the IEP during the 2010-11 school year was a substantive violation. Specifically, Plaintiffs allege that the District failed to adequately address M.W.'s performance in four areas: (1) lack of progress in reading comprehension; (2) lack of progress in math and writing; (3) lack of academic growth over two

years in the same 2nd grade program; and (4) failure to achieve IEP goals. The IHO generally agreed, determining that M.W. "made very little if any progress during School Year 2010-2011." IHO Dec. at 4 (citing test scores).

The SRO found that the evidence did not support the IHO's statement that M.W. did not make adequate progress during the 2010-11 school year. The SRO recognized the district's position that standardized test results are not a reliable indicator of M.W.'s progress, but determined that even assuming that the tests showed minimal progress, "the hearing record as a whole supports the conclusion that the student made meaningful progress in the district's program during the 2010-11 school year." SRO Dec. at 12. The SRO supported this finding with ample references to testimony from M.W.'s teachers. *See* SRO Dec. at 12-15. The SRO further found that even though M.W. had only achieved 4 out of 27 goals from the IEP, he had made at least some progress toward achievement in the majority of the goals. The Court finds the portion of the SRO Decision regarding M.W.'s progress during the 2010-11 school year to be well-reasoned and supported by the evidence. The SRO's reliance on the District witnesses and evidence is not a basis for this Court to dispute her findings as "even if the SRO gave greater weight to the District's experts, a court cannot choose between competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews." *G.W. v. Rye City Sch. Dist.,* No. 11 Civ. 8208, 2013 WL 1286154, at *24 (S.D.N.Y. Mar. 29, 2013) (citations omitted). The Court finds that the SRO's decision on this issue is sufficiently well-reasoned and supported by the record to merit deference.

    *b. Failure to offer a FAPE for 2011-12 school year*

The SRO also overturned the IHO's decision regarding the appropriateness of the June 2011

IEP. She discounted the IHO's finding that the annual goals were overly ambitious, determining instead that the 34 goals set forth "were appropriate for the student based on his identified needs and present levels of performance." SRO Dec. at 17. The SRO further disagreed with the IHO's decision regarding the propriety of placing M.W. in a 4th grade general education classroom, finding that the June 2011 IEP "was designed to support the student's special education, language, academic and social/emotional needs, while providing him with appropriate access to his nondisabled peers." SRO Dec. at 20.

As discussed above, however, the SRO did not consider the lack of 1:1 staffing in the classroom in making her determination, an issue that was properly raised. Although the Court has considered remanding this matter to the SRO for reconsideration, it finds that the IHO decision provides an ample record for review. *See New York City Dep't of Educ. v. V.S.,* No. 10-CV-05120, 2011 WL 3273922, at *10 (E.D.N.Y. July 29, 2011) (noting that "the drawbacks of remanding the case to the SRO outweigh the benefits, particularly where one state administrator has already provided a thoughtful opinion on the merits of the case"). As the IHO considered the entire record including the issue of the 1:1 staffing, this Court will review the IHO analysis regarding the appropriateness of the June 2011 IEP.

The IHO's finding that the June 2011 IEP was inappropriate was based on several factors, including her conclusions regarding M.W.'s lack of progress during 2010-11. The SRO found that M.W. made meaningful progress during the 2010-11 school year, a finding the Court has not disturbed. M.W.'s performance that year was not, however, the sole basis for the IHO's decision. In addition, she was concerned about what she determined to be the shift in educational focus, the magnitude of the change between the two school years, both in rigor and in structure, and the lack

of supports for that change.

The IHO expressed general concerns regarding the focus of the District's approach, noting that "the thrust of the 2010-2011 IEP was special instruction in contrast to the thrust of the 2011-2012 IEP at issue, which is general education." IHO Dec. at 5. She also indicated that "the proposed mainstreaming would strand MW in a class in which he would not have been able to function, thereby further enlarging the ever-widening gap between MW and his peers and thereby not providing a FAPE for this child." IHO Dec. at 14. She further found the June 2011 IEP's goals to be "much too lofty to be deemed appropriate" and were "setting M.W. up for failure." IHO Dec. at 26. The above findings were not created in a vacuum, but rather were based upon, and supported by, the evidence presented at the hearing.

The IHO made additional findings in support of the conclusion that M.W. was not offered a FAPE. The IHO clearly determined that the June 2011 IEP proposed an environment without adequate supports in place, most importantly "the service of a 1:1 assistant in the 4th grade general education class." IHO Dec. at 27. She concluded that the 4th grade general education classroom was not appropriate for M.W. "given his demonstrated need, recognized by the District, for much prompting and redirection" and the "lack of a one-to-one aide to refocus the child." IHO Dec. at 8-9. The lack of a 1:1 aide was central to the IHO's decision regarding the appropriateness of the June 2011 IEP.[10] *See, e.g.,* IHO Dec. at 5 ("the CSE should not have recommended the program at issue at this hearing consisting of a general education placement with special education pullouts for some subjects and no 1:1 aide assigned to MW"). While the IHO was clearly impressed by Ms. Ferby-

---

[10]The Court does not read the IHO's decision to suggest that M.W. requires 1:1 support in all situations, but rather that such support was critical to this proposed plan.

Guy, who would have been the push-in consultant teacher, the IHO concluded that Ferby-Guy would have "limited and insufficient exposure" to M.W of up to two hours per week of direct and indirect teaching.  IHO Dec. at 12-13.

Given the evidence regarding the extent of individual support that M.W. required during the 2010-11 school year, the proposed change to a general education class almost twice the size of his previous class, the increase in rigor of the curriculum, coupled with the lack of support proposed for the 2011-12 school year, the Court agrees with the IHO's determination that the June 2011 IEP did not provide M.W. with a FAPE.

## B.  Appropriateness of the Private Placement

Having established that the June 2011 IEP failed to offer M.W. a FAPE, the Court turns to the second prong of the *Burlington/Carter* test, the appropriateness of the parents' unilateral placement of M.W. at SLCD.  When parents unilaterally place their child in a private school because that child has been denied a FAPE, the parents bear the burden of establishing that the private school they have chosen is appropriate.  *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.,* 773 F.3d 372, 386 (2d Cir. 2014) (citations omitted).  At this stage of the court's analysis, however, the review of the private placement "is more informal than review of the original IEP:  a private placement need not meet the IDEA requirement for a FAPE." *R.E.,* 694 F.3d at 187 n.3; *see also Frank G.,* 459 F.3d at 364 (parents "are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education").  The main inquiry is "whether a placement–public or private–is reasonably calculated to enable the child to receive educational benefits." *Gagliardo,* 489 F.3d at 112 (internal quotation and citation omitted).

In addition, parents "may not be subject to the same mainstreaming [or LRE] requirements as a school board." *C.L.,* 744 F.3d at 837 (alteration in original) (internal quotation and citation omitted). As the Second Circuit recognized, parents are frequently forced to turn to private schools that specialize in educating only disabled students that are thus "necessarily restrictive as they do not educate disabled and nondisabled children together, and may be more restrictive than the public school from which the child was removed." *Id.* Accordingly, requiring parents to find a private school that is "at least as nonrestrictive as the FAPE-denying public school, would undermine the right of unilateral withdrawal the Supreme Court recognized in *Burlington.*" *Id.*

Although evidence of a child's success at the unilateral placement is relevant to the court's review, such evidence "does not itself demonstrate that a private placement was appropriate." *Gagliardo,* 489 F.3d at 115. The Court must look to the "totality of the circumstances" and the parents "need only demonstrate that the placement provides 'educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Frank G.*, 459 F.3d at 364–65 (quoting *Rowley,* 458 U.S. at 188-89, 102 S. Ct. at 3034).

The SRO did not address the issue of whether the parents' placement was appropriate in light of her determination that the District offered M.W. a FAPE. In such situations, the Court looks to the IHO decision and gives that decision due deference. *See, e.g., P.L. v. New York City Dep't of Educ.*, – F. Supp. 3d –, 2014 WL 4907496, at *17 (E.D.N.Y. Sept. 29, 2014);*V.S.,* 2011 WL 3273922, at *11; *see also C.F.,* 746 F.3d at 82 (Second Circuit looked to the opinion of the IHO where neither the SRO nor the District Court reached the issue of the appropriateness of the parents' placement).

The IHO noted the "uncontroverted and ascertainable progress" made by M.W. at SLCD as established by testimony and documentary evidence. IHO Dec. at 29. The IHO further found that the testimony of the District's witnesses and its documentary evidence did not overcome the testimony from the SLCD professionals. IHO Dec. at 30. As to the quality of the program at SLCD, the IHO affirmatively cited, with reference to supporting evidence, the use of a language-based curriculum throughout the school day, the small class size of twelve students per class (12:2:2) and six students in a reading group (6:1:1), and the assignment of a speech pathologist to two classes and a psychologist to each class. IHO Dec. at 30-32. She particularly stressed the appropriateness of the modeling of language by all of the teachers and paraprofessionals throughout the day as well as the use of visual supports. IHO Dec. at 33. Regarding socialization, the IHO credited testimony that there is specific training for M.W. in social skills, and that the students in his class range in age from 9 to 11. Significantly, although the class is designated as a 4th grade class, the students function in a range from 1st to 3rd grade, a level more consistent with M.W.'s needs. IHO Dec. at 32.

The IHO further documented M.W.'s actual progress in several areas including reading comprehension. Finally, the IHO found that the lack of a 1:1 aid was not "a fatal defect for this program" given the smaller class size of 12, the full-time assignment of 2 special education teachers and 2 teaching assistants, and the other professionals assigned to the classroom. IHO Dec. at 36. This finding is consistent with the IHO's earlier determination that the lack of a 1:1 aide in the District's IEP was problematic when viewed in conjunction with the proposed placement in a large, 4th grade general education class that would not have sufficient supports.

The Court finds the IHO's analysis of the placement at SLCD to be thorough, well-reasoned,

amply supported by the record, and entitled to deference.  The Court agrees with the IHO's conclusions and finds that the program at SLCD is both designed to meet M.W.'s needs and provides adequate support services to allow him to benefit from the program.  Accordingly, the placement at SLCD is appropriate and the second prong of the *Burlington/Carter* test is satisfied.

### C.  Balance of the Equities

The final prong of the *Burlington/Carter* test requires the Court to determine whether equitable considerations favor reimbursement.  The IDEA provides that reimbursement "may be reduced or denied" for various reasons, including "upon a judicial finding of unreasonableness with respect to actions taken by the parents."  20 U.S.C. § 1412(a)(10)(C)(iii); *see also Frank G.,* 459 F.3d at 363-64 (noting that "because the authority to grant reimbursement is discretionary, equitable considerations relating to the reasonableness of the action taken by the parents are relevant in fashioning relief" (internal quotation marks and citation omitted)).   Again, the IHO's decision merits deference since the SRO did not reach this issue.  *See C.L.,* 744 F.3d at 840; *C.U.,* 23 F. Supp. 3d at 233.

The District argues that H.W.'s actions in the late winter and spring of 2011, including visiting SLCD, reflected her decision to place M.W. at that school, and that her participation in the CSE meetings "was for the sole purpose of trying to convince the CSE to fund her unilateral placement of M.W. at SLCD, not to engage in an interactive process with the District."  Def's Mem. at 25.   The IHO, addressing the same arguments, determined that the evidence "convincingly established that the equities favor the Parents in their dealings with the District," that the parents acted in good faith, and that the District "has not shown otherwise."  IHO Dec. at 41.  She reviewed the evidence, outlining H.W.'s many attempts to avoid a unilateral placement, and noted that the

parents did not sign an agreement with SLCD until after the CSE meetings were concluded.  She

further found there to be a lack of credible evidence that the parents had already decided to place

M.W. at SLCD prior to the CSE meetings.  *Id.*

When the District failed to offer M.W. a FAPE, his parents properly turned to a private

placement.  The fact that they had made investigations regarding that placement prior to the

District's decision is not material since they participated in the CSE meetings and did not make the

final decision until after the CSE made its recommendations.  Accordingly, the Court agrees with

the IHO's reasoning and defers to her conclusion that the equities favor the parents.

## IV.  ATTORNEYS' FEES

The IDEA expressly provides that the court may, in its discretion, "award reasonable

attorneys' fees as part of the costs–(I) to a prevailing party who is the parent of a child with a

disability. . . ." 20 U.S.C. § 1415 (i)(3)(B)(i)(I).  The Court finds that Plaintiffs are prevailing parties

and are thus entitled to seek an award of reasonable attorneys' fees. *See generally Buckhannon Bd.*

*& Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 603, 212 S. Ct. 1835,

1839 (2001) (defining prevailing party as "one who has been awarded some relief by the court").

The parties are ordered to confer regarding attorneys' fees in an effort to reach an agreement

without further judicial intervention.  If the parties are unable to reach such an agreement, they shall

prepare and submit a proposed briefing schedule for the Court's approval.

## CONCLUSION

Both motions are granted in part and denied in part.  Defendant's motion for summary

judgment is granted to the extent that the Court upholds the SRO Decision regarding the adequacy

of M.W.'s placement during the 2010-11 school year.  Plaintiffs' motion is granted to the extent that

the SRO Decision regarding the adequacy of the June 2011 IEP is overturned and the IHO Decision regarding the June 2011 IEP and Plaintiffs' unilateral placement of M.W. in a private school is sustained. Defendant shall reimburse Plaintiffs for the tuition paid to SLCD for the 2011-12 school year, and for reasonable attorneys' fees in an amount to be determined. The motions are denied in all other respects.

The parties shall provide the Court with a status report and/or a briefing schedule regarding the attorneys' fees issue on or before **May 1, 2015.**

Dated: Central Islip, New York        **SO ORDERED:**
      March 31, 2015

                              s/ Steven I. Locke
                              STEVEN I. LOCKE
                              United States Magistrate Judge